IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION



UNITED STATES OF AMERICA

v.  CRIMINAL NO.: 3:20CR128CWR-LRA

WILLIAM GLENN CHUNN, 18 U.S.C. § 1959(a)(3)
    a/k/a "BIG HEAD"; 18 U.S.C. § 1959(a)(5)
AARON MATTHEW RENTFROW 18 U.S.C. § 3
    a/k/a "Mongo";
JEREMY CHAD DENNIS,
    a/k/a "JD";
JOHNATHON AARON REYNOLDS;
DANIEL WADE HOLLER,
    a/k/a "Knucklehead."

**The Grand Jury Charges:**

<u>General Allegations</u>
<u>The Racketeering Enterprise: The Aryan Circle</u>

**INTRODUCTION**

1. At all times relevant to this Indictment, the defendants **WILLIAM GLENN CHUNN**, a/k/a "BIG HEAD"; **AARON MATTHEW RENTFROW**, a/k/a "Mongo"; **JEREMY CHAD DENNIS**, a/k/a "JD"; **JOHNATHON AARON REYNOLDS**; and **DANIEL WADE HOLLER**, a/k/a "Knucklehead"; and others, known and unknown to the Grand Jury, were members and associates of the Aryan Circle (hereinafter the "AC"), a criminal organization whose members and associates engaged in controlled substances distribution, firearms trafficking, and acts of violence, including acts involving murder, assault, robbery, witness intimidation, and kidnapping. At all times relevant to this Indictment, the AC operated throughout the Southern

District of Mississippi, the states of Alabama, Arkansas, Kentucky, Louisiana, Missouri, New Jersey, Pennsylvania, Texas, Virginia, and elsewhere.

### Structure and Operation of the Enterprise

2. The structure and operation of the AC included, but was not limited to, the following:

    a. The AC was a violent, race-based, "whites only" prison-based gang with hundreds of members operating inside and outside of state and federal penal institutions throughout Alabama, Arkansas, Kentucky, Louisiana, Mississippi, Missouri, New Jersey, Pennsylvania, Texas, Virginia, and elsewhere. The AC offered protection to white inmates if they joined the gang.

    b. The AC was established in approximately 1985 within the Texas Department of Criminal Justice (TDCJ), where the traditional power centers of the AC and members of the gang's leadership structure resided. Recently, the AC's structure and influence expanded to rural and suburban areas throughout Texas, Louisiana, and Missouri, among other states. The AC emerged during a period of internal turmoil within the Aryan Brotherhood of Texas (ABT). Its original membership contained several ex-ABT members as well as others rejected for ABT membership. The AC was relatively small in comparison to other prison-based gangs, but grew in stature and influence within TDCJ in the 1990s, largely through violent conflicts with other gangs, white and non-white alike, including the Mexican Mafia, the ABT, and others.

    c. The AC had a detailed and uniform organizational structure, which is outlined - along with various rules, procedures, and code of conduct - in a written "constitution" widely distributed to members throughout Texas, Louisiana, and elsewhere.

    d. The AC had a defined militaristic structure. AC members referred to the gang as the "Family." The AC had a complex organizational structure, which continued to evolve over time. The AC was overseen and directed by a five-member "Upper Board." The Upper Board had ultimate authority in all gang matters. Subordinate ranking members served to support the Upper Board to enforce gang members' discipline and adherence to established AC rules and laws. The Upper Board was comprised of the president, vice president, administrative chairman, and two other members. The AC had six branches: one for Texas prisons; one for the federal prison system; one for out of state prisons; one for international members; one known as a motorcycle biker branch; and one for the "free world" (non-incarcerated gang members), each of which had its own Middle Board. The out of state prisons were further divided into a handful of regions, each incorporating one or more states. The Middle Boards each included the Upper Board members, as well as the vice president and director of each branch. Rules and regulations for the various branches came from Center Rings, which included all Middle Board Members.

    e. The AC was also divided between prison and free world chains of command. Each prison had its own hierarchy. In the free world, Texas was divided into districts, presided over by district captains, who reported to majors who controlled a number of districts. The AC's ranking structure remained constant; however, personnel changes (promotions, demotions, and terminations) occurred frequently.

    f. The AC also had certain members assigned to the "Task Force," which was comprised of a small group of members handpicked by the Upper Board to enforce the rules of the organization and perform specific tasks or responsibilities. The Task Force was led by a commander and such tasks could range from managing some aspect of the AC's organization to performing a "hit" (kill order) or other specific criminal act of violence, including meting-out

punishment against fellow gang members who violated the gang's rules or killing rival gang members.

   g. AC Upper Board leaders had the authority within the gang to issue "D.O.'s" (direct orders) and mete out punishment. A D.O. was an assignment given to a subordinate AC member that would serve a purpose for the AC. The D.O. from a leader ordering a "violation" could be classified as "minor, serious, or major." The order could be an "S.O.S." (smash on sight), meaning the assault of an AC member who had committed a violation of the AC rules, which usually resulted in the removal of that member's AC "patch" (gang tattoo) and membership. The D.O. could also be a "Green Light," meaning an attack up to and including the murder of a rival gang member or of an AC member or associate who had committed an egregious violation of the gang's rules. Failure to perform a D.O. resulted in the assigned member being in violation of the rules. Punishment for failing to complete the D.O. could range anywhere from a fine, written violation, beating, or death.

   h. Members of the AC greeted each other and showed their membership in the gang using a handshake intended to represent the motto: "Silence is Golden; Silence is Deadly; Silence is Mandatory; My Honor is called Loyalty!" The AC employed a robust symbology as well, using depictions of Nazi-style inspired symbols and artwork to demonstrate their affiliation. Members often had tattoos incorporating one or more Nazi-style symbols including, but not limited to, the Iron Cross, eternal flame, "13" (for first and third letters of the alphabet – "AC"), swastika, and Schutzstaffel ("SS") lightning bolts, as well as state-specific symbols. The most coveted tattoo of AC membership was the AC patch, which could be worn only by fully made members who generally ascended to full membership by committing a "blood-in mission" (aggravated assault or murder) on behalf of the gang. The design and shape of the patch evolved over time. The diamond

tattoo was the basic AC tattoo or "patch." It had many variations, including variations for different states, though common to each tattoo was a swastika tilted to resemble a diamond, "SS" bolts, and the letters "AC" in the center. An older version of the AC patch was a circle with "SS" bolts inside it. The AC lexicon included "113%" (100% Aryan Circle), "1388" or the Aryan Circle variation of white supremacist code "14/88" (the 88 stood for Heil Hitler), "CFFC" (Circle Forever, Forever Circle), and "DFFD" (Diamond Forever, Forever Diamond), among others. The colors associated with the AC were blue and gray, and members of the AC often demonstrated their affiliation with the AC by wearing clothing containing the colors blue and gray or incorporating some of the gang's other symbols or phrases.

    i. Once released from incarceration, AC members were required to remain loyal to the AC and to immediately report to outside leaders to further the goals of the AC through criminal activity. They were required to attend "church" or meetings, which were held to discuss and conduct AC gang business. One of the goals of the AC was to recruit new members. AC members were recruited from both inside and outside state and federal penal institutions. In order to be considered for AC membership, a person had to be sponsored by another AC member. Once sponsored, a prospective member had to serve a "pre-prospect" term usually of not less than six months, during which he was referred to as a prospect, and his conduct was observed by other gang members. During this period, the prospect was required to study and learn the AC constitution and by-laws. During the prospect period, the individual was considered part of the AC family and entitled to the full protection of the gang. The prospect was also subject to the rules and orders of the gang. If the prospect's conduct during the probationary period was deemed satisfactory, his membership to the gang was submitted to the gang members. The vote had to be unanimous for the prospect to be admitted to the AC. The prospect could be "black-balled" by a

single member of the gang, and refused admission to the AC. All AC members were required to attend monthly "church" meetings where criminal activity was discussed, financial proceeds from criminal activity were collected including, but not limited to, collection of drug proceeds from subordinate gang members for senior AC gang leaders and disciplinary beatings of fellow AC gang members were administered. All incarcerated AC members were expected to "put in work" for the "Family" in order to earn the right to wear the AC patch. This normally required committing an act of violence on behalf of the organization. This rule for AC members in the free-world was more loosely applied. Membership in the AC was for life. There was generally no retirement from the AC.

    j.  Unlike most major prison-based gangs, the AC admitted women as full members and had a significant female membership that belonged to the women's branch of the AC. Some women had achieved positions of considerable importance and responsibility within the organization. In addition to members, the enterprise included those closely affiliated with the AC, who were called "associates." Wives or girlfriends of AC members who were not themselves full patched members were often associates. They were allowed to associate with the AC so long as they complied with the gang's rules and served to promote the goals of the "Family." Female associates functioned as communications hubs, facilitating gang communications and criminal activities among imprisoned members throughout the penal system by using the telephone, the internet, the United States Mail, and common carriers. They also smuggled drugs, cellular telephones, and other items of contraband to imprisoned gang members.

### The Racketeering Enterprise

3.  The AC, including its leaders, members, and associates, constituted an "enterprise," as defined in Title 18, United States Code, Section 1959(b)(2) (hereafter "the enterprise"), that is

a group of individuals associated in fact, which was engaged in, and the activities of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

### Purposes of the Enterprise

4. The purposes of the enterprise included, but were not limited to, the following:

    a. Enriching the leaders, members, and associates of the enterprise through, among other things, illegal trafficking of controlled substances and firearms;

    b. Preserving, protecting, and enhancing the power, territory, reputation, and profits of the enterprise through the use of threats, intimidation, and violence, including, but not limited to, acts involving murder, assault, obstruction of justice, and other acts of violence;

    c. Promoting and enhancing the enterprise and the activities of its leaders, members, and associates;

    d. Keeping victims in fear of the enterprise and in fear of its leaders, members, and associates through threats of violence and actual violence;

    e. Providing financial support to enterprise members who were charged with or incarcerated for gang-related activities.

### Means and Methods of the Enterprise

5. The means and methods by which the leaders, members, and associates conducted and participated in the conduct of the affairs of the enterprise included the following:

    a. The leaders of the enterprise directed, sanctioned, approved, and permitted other members and associates to carry out acts in furtherance of the enterprise;

  b. Members and associates of the enterprise committed, conspired to commit, and threatened to commit acts of violence, including acts involving murder, kidnapping, robbery, assault, witness intimidation, and extortion to protect the enterprise's power, territory, and property;

  c. To generate income and build reputation, enterprise members and associates engaged in illegal activities under the protection of the enterprise, including, but not limited to, controlled substances trafficking and weapons trafficking;

  d. For protection, attacks, and armed combat, enterprise members and associates in the free world acquired, carried, and used firearms, and enterprise members and associates in prisons acquired, carried, and used sharp, knife-like objects, or shanks;

  e. Members and associates of the enterprise employed and used gang-related terminology, symbols, phrases, and gestures to demonstrate affiliation with the gang;

  f. To perpetuate the enterprise and to maintain and extend their power, members and associates of the enterprise committed and conspired to commit acts involving murder, witness intimidation, and assault against individuals who posed a threat to the enterprise or jeopardized its operations, rival organizations, AC members, and witnesses to illegal activities of the enterprise;

  g. Members and associates of the enterprise spoke in code when communicating over the telephone and/or in writing to avoid law enforcement detection, and communication in person was always preferable.

  h. Members and associates of the enterprise were forbidden from cooperating with law enforcement, and members of the enterprise reviewed legal paperwork for signs of cooperation.

      i.      The above-described AC enterprise, through its members and associates, engaged in racketeering activity as defined in Sections 1959(b)(1) and 1961(1) of Title 18, United States Code, that is multiple acts involving murder, in violation of the laws of Alabama, Arkansas, Kentucky, Louisiana, Mississippi, Missouri, New Jersey, Pennsylvania, Texas, and Virginia; and kidnapping, in violation of the laws of Missouri; and multiple offenses involving narcotics trafficking, in violation of Title 21, United States Code, Sections 841(a)(1), 843, and 846.

## COUNT 1

Violent Crimes in Aid of Racketeering, Assault with a Dangerous Weapon and Assault Resulting in Serious Bodily Injury to M.M.

[18 U.S.C. §§ 1959(a)(3) and 2]

6.      Paragraphs 1 through 5 of the General Allegations of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

7.      On or about August 17, 2017, in the Southern District of Mississippi, for the purpose of gaining entrance to and maintaining and increasing position in the AC, an enterprise engaged in racketeering activity, the defendants,

**WILLIAM GLENN CHUNN, a/k/a "BIG HEAD";**
**AARON MATTHEW RENTFROW, a/k/a "Mongo";**
**JEREMY CHAD DENNIS, a/k/a "JD";**
**JOHNATHON AARON REYNOLDS;**

aided and abetted by each other and others known and unknown to the grand jury, did assault M.M. with a dangerous weapon and assault M.M. which resulted in serious bodily injury, in violation of Mississippi Code Ann. §§ 97-3-7(2)(a) [Aggravated Assault] and 97-1-3 [Accessory Before the Fact] of the laws of the State of Mississippi.

In violation of Title 18, United States Code, Sections 1959(a)(3) and 2.

## COUNT 2

Violent Crimes in Aid of Racketeering, Attempted Murder

[18 U.S.C. §§ 1959(a)(5) and 2]

8.     Paragraphs 1 through 5 of the General Allegations of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

9.     On or about August 17, 2017, in the Southern District of Mississippi, for the purpose of gaining entrance to and maintaining and increasing position in the AC, an enterprise engaged in racketeering activity, the defendants,

**WILLIAM GLENN CHUNN, a/k/a "BIG HEAD";
AARON MATTHEW RENTFROW, a/k/a "Mongo";
JEREMY CHAD DENNIS, a/k/a "JD";
JOHNATHON AARON REYNOLDS;**

aided and abetted by each other and others known and unknown to the grand jury, did attempt to murder M.M., in violation of Mississippi Code Ann. §§ 97-3-19 [Murder], 97-1-3 [Accessory Before the Fact], and 97-1-7(2) [Attempt] of the laws of the State of Mississippi.

In violation of Title 18, United States Code, Sections 1959(a)(5) and 2.

## COUNT 3

Accessory After the Fact to Violent Crimes in Aid of Racketeering

[18 U.S.C. § 3]

10.    Paragraphs 1 through 5 of the General Allegations of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

11.    On or about August 17, 2017, in the Southern District of Mississippi, defendant **DANIEL WADE HOLLER**, a/k/a "Knucklehead," knowing that an offense against the United States had been committed, to wit: the violent crimes in aid of racketeering in Counts 1 and 2, in

violation of Title 18, United States Code, §§ 1959(a)(3) and (a)(5), did receive, relieve, comfort, and assist the offenders, in order to hinder and prevent their apprehension, trial and punishment.

In violation of Title 18, United States Code, Section 3.

*[signature]*
D. MICHAEL HURST, JR.
United States Attorney

**A TRUE BILL:**
**S/SIGNATURE REDACTED**
**Foreperson of the Grand Jury**

This indictment was returned in open court by the foreperson to deputy foreperson of the Grand Jury on this the 22nd day of September, 2020.

*[signature]*
UNITED STATES MAGISTRATE JUDGE

11